506 So.2d 662 (1987)
Frank JUROVICH, Sr.
v.
Michael CATALANOTTO, et al.
No. 86-CA-585.
Court of Appeal of Louisiana, Fifth Circuit.
April 13, 1987.
Writ Denied June 19, 1987.
*663 Berney L. Strauss, New Orleans, for plaintiff-appellant.
John J. Weigel, John M. Holahan, Jr., New Orleans, for defendants-appellees.
Before CHEHARDY, C.J., and BOWES and GOTHARD, JJ.
CHEHARDY, Chief Judge.
The plaintiff, Frank Jurovich Sr., was severely burned by flaming adhesive from a can of Consoweld DuraBeauty 803 contact bond cement that ignited while being used by a workman in a kitchen renovation. Plaintiff sued the workman and his insurer; the distributor of the adhesive, its parent corporation and their insurer; the local distributor of the adhesive and its insurer; and the manufacturer of the adhesive (Roberts Consolidated Industries, Inc.) and its parent corporation (Champion International Corporation).
All defendants except Roberts and Champion settled with the plaintiff prior to trial. During the 16-day trial, the plaintiff attempted to prove Roberts, as manufacturer of the adhesive, was liable under both negligence and strict liability theories of products liability. After the parties rested their cases, Champion was dismissed in a directed verdict.[1] The jury returned an 11-1 verdict in favor of Roberts. (See Appendix 1.)
The plaintiff has appealed, assigning as error the trial court's jury instructions with respect to Louisiana products liability law, the trial court's ruling excluding evidence of similar accidents, and the trial court's refusal to allow evidence of postaccident events and remedial measures.
The facts of the case are as follows:
On December 30, 1974, Frank Jurovich Sr. visited his son's home to admire the newly-renovated kitchen. The job had been *664 performed by Michael Catalanotto, a professional countertop installer. Catalanotto was preparing to install the final piece of plastic laminate, which was to go on the side of the cabinet adjacent to and immediately above the stovetop. The plaintiff and his wife, together with the plaintiff's son and daughter-in-law, were in the kitchen/dining area waiting for Catalanotto to finish.
Catalanotto opened a new one-gallon can of Consoweld DuraBeauty 803 contact bond cement to perform the job. Catalanotto, who had sixteen years of experience installing plastic laminate, had used Dura-Beauty cement many times before. Dura-Beauty was manufactured by Roberts Consolidated Industries, Inc., for Consoweld Industries, which marketed and distributed the product under its own label. Roberts had advised Consoweld of the labeling requirements of the Federal Hazardous Substances Act and of the hazardous contents of the product. The artwork on the label was designed by Consoweld, which supplied the labels to Roberts for placement on the packages at the factory. Roberts supplied the product to Consoweld in tubes, pints, one-gallon cans and five-gallon cans.
DuraBeauty was classified as "extremely flammable" under the Hazardous Substances Act and its label contained the warnings prescribed by that act, among which were the following:
"DANGER! EXTREMELY FLAMMABLE VAPOR HARMFUL AND MAY CAUSE FLASH FIRE (Read back panel carefully for other cautions)"
"VAPORS MAY IGNITE EXPLOSIVELY. Prevent build-up of vaporsopen all windows and doorsuse only with cross ventilation. Keep away from heat, sparks and open flame. Do not smoke: Extinguish all flames and pilot lights: Turn off stoves, heaters, electric motors, and other sources of ignition during use and until all vapors are gone. * * * HAZARDOUS INGREDIENTS: METHYLETHYL KETONE, TOLUENE, PETROLEUM DISTILLATES ACETONE."
(See Appendix 2.)
Catalanotto, who testified he was aware of the flammable characteristics of the product, warned the plaintiff not to smoke a cigarette while he was using the adhesive. After turning off the gas supply to the stove and oven and feeling the top of the stove to be sure the pilot light was off, Catalanotto placed a piece of scrap laminate across the stove burners, set the open can on top of this, and switched on the stove hood exhaust vent, with the intention of using it for ventilation. Although the kitchen door was open, Catalanotto did not open any other doors or windows in the house.
Catalanotto began brushing the adhesive on the side of the cabinet up near the stove hood, less than a foot below the exhaust fan, when a flame appeared underneath the hood. The flame leaped from the adhesive on the cabinet into the opened can of Dura-Beauty.
Catalanotto picked up the burning can of adhesive by grasping its lower portion with his hands. He testified the bottom part of the can was cool and he had no difficulty holding it. He did not say anything, but turned to walk toward the open kitchen door, which was about four feet away. He was in no distress and had not requested assistance.
Mr. Jurovich Sr. quickly came over and took hold of part of the can, walking with Catalanotto toward the door. As they reached the doorsill, the flames spouted higher and somehow the can spilled, igniting Jurovich's clothing. Jurovich sustained second- and third-degree burns over 40% of his body.[2]
The expert testimony at trial overwhelmingly established the probable cause of ignition as the motor of the vent fan over the stove. The experts concluded that a lack of adequate ventilation allowed the flammable vapors to build up. The vapors are heavier than air and normally sink to the *665 ground, but using the exhaust fan caused the vapors to be sucked upward, where they most likely were ignited by sparking of the fan motor. Catalanotto testified he was aware of the flammability of the product, but admitted he had not read the label in many years and thus was unaware of the warning against using electric motors and also of the warning to open all doors and windows.

I.
In arguing the first assignment of error, plaintiff cites the case of Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986), which set forth a new theory of recovery under products liability: a classification of products that are "unreasonably dangerous per se." Plaintiff asserts the trial judge erred in failing to instruct the jury regarding this category of products, which the Halphen court defined as follows: "A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product." 484 So.2d at 114.
Under the "unreasonably dangerous per se" theory, a plaintiff is not entitled to impugn the conduct of a manufacturer for its failure to adopt an alternative design or to affix a warning or instruction to the product, because the manufacturer's conduct is irrelevant to this theory. However, a warning or other feature actually incorporated in the product when it leaves the manufacturer's control may reduce the danger-in-fact of the product.
There is no merit to plaintiff's assertion that the trial judge erred in failing to include a jury instruction regarding this theory, for the simple reason that the Halphen decision was not rendered until February 24, 1986, almost five months after the trial of Mr. Jurovich's case. Further, the plaintiff failed to request such an instruction. The plaintiff contends, however, that his assertion in the trial court that the product was "unreasonably dangerous for home use" is the same as "unreasonably dangerous per se."
Even if we agreed with the latter contention, we do not find that plaintiff proved in this case that DuraBeauty is "unreasonably dangerous per se." In the Halphen case, the product being challenged was asbestos as used in building products. There the court was dealing with a risk of danger that was unknown when the product was manufactured. In the case at bar, the hazards and propensities of the product were well known, as evidenced by the profusion of warnings on the label.
The expert witnesses here explained the benefits of the productease of application, speed of evaporation of the solvents, strength of the bondand its dangers chiefly the flammability potential. They contrasted these with the alternative types of contact bond cements available, which are based on different solvent systems (chlorinated solvents or water-based latex). The other types of contact adhesives contained drawbacks that made them less attractive to both the amateur and professional users, for reasons of either safety or performance.
Further, the evidence indicated that extremely flammable adhesives (i.e., those based on petroleum distillate solvents) have been on the market for many years and that millions of gallons have been used. Plaintiff failed to present sufficient competent evidence of other accidents to support his claim that the hazards of this product outweigh its utility. (See discussion under Section II, infra.)
In light of the warnings on the can and Catalanotto's failure to follow the directions concerning ventilation and turning off electric motorshis failure even to read the safety warningsthis is an unsuitable case in which to apply the Halphen category of "unreasonably dangerous per se."
In addition, we find no merit to plaintiff's assertion that other portions of the jury instructions were confusing or erroneous. The enunciation of a new products liability category in Halphen does not change the existing theories regarding *666 "failure to warn" and "defective design." We find the jury charges, as a whole, adequately set forth the law applicable at the time and, therefore, do not constitute reversible error. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3 Cir. 1985), writs denied 480 So.2d 738.

II.
Nor do we find merit to plaintiff's second assignment of error, in which he argues he should have been allowed to present evidence of similar accidents. It is true that in cases where defective design is alleged, the history of accidents is relevant and has probative value in showing whether the design in question is unreasonably dangerous. Foster v. Marshall, 341 So.2d 1354 (La.App. 2 Cir.1977), writs refused 343 So.2d 1067, 343 So.2d 1077. In this case, however, the major objection raised to the evidence plaintiff attempted to present was that it was hearsay. The witnesses whose testimony plaintiff wished to present to the jury had no personal direct knowledge of the facts of the accidents plaintiff wanted them to describe.
Specifically, plaintiff attempted to introduce testimony by two expert witnesses, Ray Hauser and Kendrick Eilar, relating to suits filed in other parts of the country arising out of fires or explosions during the use of extremely flammable contact adhesives. The judge allowed Hauser to testify to three such cases, which he had investigated personally as an expert witness, but disallowed his testimony as to two others in which all Hauser's information had been obtained through other persons. Eilar was a former director of research and development for Roberts; plaintiff wished him to testify regarding claims filed against Roberts during his tenure with the company. Eilar, however, had no direct personal knowledge of any of the claims and all of his information was obtained from Roberts' files, from documents prepared by other persons.
The judge ruled that for each similar accident that plaintiff wished to prove, plaintiff would be required to bring in someone who investigated the whole accident (that is, who would have direct knowledge of the operative facts of each case). We find no error in that ruling. The trial judge was not prohibiting plaintiff from introducing evidence of similar accidents; he was simply requiring plaintiff to produce competent evidence.
Plaintiff complains further that due to that ruling, plaintiff was unable to introduce the testimony of other witnesses who knew of other accidents involving the use of the product. Plaintiff made no attempt at trial, however, to proffer those witnesses' testimony (with one exception).
When a trial judge rules testimony of a witness inadmissible, a proffer can be made; it is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion was error. LSA-C.C.P. art. 1636; Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1 Cir.1984), writ denied 467 So.2d 531.
Plaintiff did proffer the testimony of Mrs. Cynthia Brown, whose husband had been killed in an explosion arising out of the use of an extremely flammable contact adhesive. Because Mrs. Brown was not present when the explosion occurred and could only establish the cause of the explosion by reference to what she had been told by others, the defendant objected to her testimony as hearsay. The judge excluded the testimony not only on that basis, but also because he felt the prejudicial effect of allowing her to testify to the few facts she knew directly would outweigh the probative value of the evidence. We find no error in that ruling.

III.
Plaintiff's third assignment protests the judge's refusal to allow evidence of postaccident events and remedial measures. Specifically, plaintiff desired to introduce evidence that in 1976 Roberts voluntarily discontinued packaging the product for retail sale and that in 1978 the federal Consumer Products Safety Commission issued a ruling that banned packaging of extremely *667 flammable contact adhesives in one-gallon sizes or smaller and barred sale of such adhesives in retail outlets. Plaintiff also wished to show that the defendant, Roberts, had actively lobbied the CPSC to obtain such an industry-wide restriction.
Subsequent product changes generally are inadmissible to show negligence or culpability. Esta v. Dover Corp., 385 So.2d 439 (La.App. 1 Cir.1980), writ denied 392 So.2d 690. Plaintiff argues that the rule disallowing evidence of subsequent changes was developed with regard to negligence cases and should not be applied to strict liability situations, citing cases from other states.
In Smith v. Formica Corp., 439 So.2d 1194 (La.App. 1 Cir.1983), the accident made the basis of the suit arose out of the use of Formica Brand 140 adhesive, which was also manufactured by Roberts Consolidated Industries. In that case, the court ruled that evidence of postaccident federal regulatory changes is irrelevant to a determination of whether a product is unreasonably dangerous at the time a party alleging strict liability suffers injury.
Plaintiff argues that the Smith case is predicated on a negligence-based theory of products liability and that the enunciation of the "unreasonably dangerous per se" category in the Halphen case makes such an analysis irrelevant. Plaintiff asserts, "The only question is whether a risk-utility analysis reveals that the danger-in-fact of the product, whether foreseeable or not, outweighs its usefulness."
Considering our conclusion, supra, that the Halphen theory is not applicable under the facts before us, we see no need to rule on this argument.
Although such evidence may be accepted in other jurisdictions around the country, we do not consider the case at bar an appropriate vehicle in which to institute such a change in Louisiana law. See Mobley v. General Motors Corp., 482 So.2d 1056 (La.App. 3 Cir.1986), writ denied 486 So.2d 735. Accordingly, we find no error in the judge's disposition of this issue.
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed against the appellant.
AFFIRMED.

APPENDIX 1.
The jury's verdict was rendered based on the following jury interrogatory:
"1. I have explained to you the various standards of faultwhether negligence or strict liabilitythat apply to each of the involved persons or companies in this case. For each of these persons or companies, you are to determine (a) whether the person or company was at fault and (b) if so, whether that fault was a substantial factor in causing this accident. If you answer affirmatively to both (a) and (b), check off `yes' beside the person or company name. If you answer negatively to either (a) or (b) or to both (a) and (b) then check off `no' beside the person or company name. Then, if you checked the `yes' column you should determine in what percentage Mr. Jurovich's fault contributed to the accident.

 (Percentage)
 NO YES (If yes)
Roberts Consolidated
Industries, Inc. X _____ ____________
(If your answer is No, stop here and return to the
courtroom.)
Frank Jurovich, Sr. _____ _____ ____________
Michael Catalanotto
d/b/a
Mike's Countertops _____ _____ ____________
Consoweld
Distributors, Inc. _____ _____ ____________
The amounts entered above must add up to 100%.
 2. State the total amount of damages expressed in
dollars sustained by Frank Jurovich, Sr. as a result of
this accident.
 $___________
 Gretna, Louisiana, this 11 day of October, 1985.
 (s) Jesse L. Pipkin
 Foreperson"

*668 
NOTES
[1] Although plaintiff's motion for appeal stated he wished to appeal the dismissal of Champion, we find no written judgment in the record dismissing Champion. Technically, therefore, the appeal is premature as to Champion. Plaintiff does not mention the dismissal of Champion in his brief to this Court.
[2] The defendant informs us in its brief that between time of the trial and the hearing of this appeal, Mr. Jurovich died of causes unrelated to the injuries sustained in the accident.